LAWSON & NELSON SASH & DOOR COMPANY v. ASSOCIATED INDEMNITY CORPORATION.[1]

December 2, 1938.

No. 31,758.

[1] Reported in 282 N. W. 481.

*Melvin, Brown & Sherman,* for appellant.
*Paul J. McGough,* for respondent.

JULIUS J. OLSON, JUSTICE.

Plaintiff having met with an adverse verdict, rendered pursuant to instructions by the court, appeals from an order denying its motion for new trial.

The action has for its background, in substance, the following facts. Plaintiff was insured under a policy of public liability issued by defendant, liability limit thereunder being $7,500. On April 17, 1934, one Hofmann was injured in an accident occurring in an alley in Minneapolis. Walter McDonald was plaintiff's employe driving its truck; Hofmann was the driver of his employer's truck. The alley was a narrow one. Plaintiff's truck arrived there first and was stopped at the mouth of the alley, McDonald having some of his employer's materials to unload. Later Hofmann came and parked his truck alongside that of McDonald, he too having goods to be unloaded for his employer. McDonald finished his job first and, while proceeding to leave, his truck came into contact with Hofmann, at least such was Hofmann's version. Just how the acci-

dent happened and whether it happened at all were questions bitterly disputed; the claims of the parties directly involved being wholly irreconcilable. McDonald's claim was that the trucks were so close together, about eight to ten inches, that the accident simply could not have happened as Hofmann claimed, which was that he was standing between the two trucks unloading crates of strawberries when McDonald moved his vehicle forward and thereby caused Hofmann's hurt. At any rate, Hofmann later brought a tort action against plaintiff and McDonald, claiming $25,000 damages (in this sum was included $2,700 special damages). Plaintiff duly notified defendant of the accident and informed it that Hofmann was claiming damages on the alleged ground of its driver's negligence. Defendant promptly, in conformity with its contract, assumed the duty of investigating the case and later the defense of the action. As trial time approached there was an opportunity to settle the case for $6,000. Defendant's local counsel recommended that such settlement be made, not because he was of opinion that there was substantial, or in fact any, merit in Hofmann's case, but because he deemed such to be "good practical business," especially because of the recognized ability of Hofmann's attorney to recover large verdicts in cases of this type. Defendant's general counsel, Mr. Sawyer of San Francisco, a man of wide experience and recognized ability, refused to consider this recommendation favorably and instructed local counsel (Mr. Watson) that defendant would not contribute beyond $4,500 toward the proposed adjustment. Upon receipt of Mr. Sawyer's decision, Mr. Watson sought and obtained the attendance of plaintiff's president, Mr. Nelson, at a conference, where the entire matter was thoroughly discussed. The real issue in this case hinges upon what then took place. Mr. Nelson's version may best be summarized by quoting rather fully his testimony:

"Well, he said that it was a bad case, that this man seemed to be hurt, and being a back case—an injury to the back—he was not so sure how bad it was, and it was pretty hard to decide, that the setup was not so good, that this man was a jailbird, as he called it, I remember, and the whole thing really rested on what the jury—

whose evidence the jury would take if it went to trial—either this Hofmann and his helper, or Walter McDonald. * * *

"He explained that this action was being brought for $25,000, and what the verdict would be no one knew, it might be $20,000—he didn't know what it would be—they had built up a pretty good doctor bill and hospital bill, and he was also drawing compensation for which the insurance company paying that compensation would want to be reimbursed if this man McDonald was the attorney for Hofmann. [Witness was referring to Robert J. McDonald, counsel for Hofmann.] * * *

"He said that he had had several conferences with McDonald, and at the time McDonald stood ready to settle for $6,500. * * *

"And that if I would pay a part of that—he specified the amount as $1,500—why, a settlement could be reached out of court. And he also thought, if he had the money and was authorized to settle with McDonald, that he could get it down to $5,500; at least he thought that could be done.

"Q. And what was your reply to that suggestion?

"A. I did not answer yes or no to it. I explained to him that we were covered for that amount and I could not see why I should pay $1,500 as long as our policy covered the amount of the claim.

"Q. And what did he say in reply to that, if anything?

"A. Well, he said that his company will not pay the full amount of the policy.

"Q. And was there any further conversation with reference to that requested contribution on your part?

"A. Well, I don't just remember everything. I am not giving you maybe word for word that was said on it, because this is a long time ago, but I am giving it to you as I remember the talk."

Mr. Watson's version thereof is as follows:

"I talked to Mr. Nelson frankly about this case and just what it meant. * * * I reviewed all the statements of the parties, not only these exhibits that were in the original investigation file, but my various conversations with their driver, Walter McDonald, what had been unearthed as to Hofmann—that we had learned that

he was then a man about 30 years of age, that at intervals he had been an inmate of various penal institutions from the time he was 12 years of age, that he had served two different terms at Glen Lake, two different terms at the training school in Red Wing, Minnesota. If I recall correctly, he had been in St. Cloud for a term of some years, and had been in the state penitentiary at Stillwater, for, I don't recall now whether it was seven or ten years, and that he had very recently been released from Stillwater, in fact released just a very few weeks prior to the happening of this accident. Then I went into the physical facts; I pointed out to him that it didn't seem possible the accident could have happened as related by Hofmann, that it was a physical impossibility. * * * I also pointed out to Mr. Nelson at that time that Hofmann was still drawing compensation—and described the picture as nearly as I could draw it, and Mr. Nelson quite frequently, in these words and in substance of what I am about to say, said that he would believe McDonald any time against this man Hofmann, and that he had every reason to believe that McDonald was telling us the truth as to the happening of this accident. Well, then I said, 'Mr. Nelson, I cannot nor can any lawyer tell you what the final result of a lawsuit is going to be; we don't know. The insurance company does not seem to be willing to pay sufficient in this case to meet the demands of Hofmann and his attorney. I suspect this case may be tried. It might result in a verdict in favor of the defendant; it might result in a verdict in favor of the plaintiff, assessing damages anywhere from $4,000 to $20,000. The limit of the policy is $7,500. Now, you can appreciate from that situation that Lawson-Nelson Company has a contingent exposure that is equal to or maybe greater than that of the insurance company.' At that time, although the demand was $6,500, I sensed that $6,000 would settle this lawsuit, and I said in effect to Mr. Nelson that in my opinion if Lawson-Nelson cared to contribute $1,500 toward a settlement, the case could be settled, and I further said to Mr. Nelson, 'I feel the case is of sufficient concern for you to consult with your own attorney'— just as I pointed out in the several letters. I further said to him, 'So far as the defense of the case is concerned, so far as the trial of

the case is concerned, it will be defended just as carefully and just as thoroughly as though you had a hundred thousand dollar interest in that policy; but nevertheless, under these circumstances, you are invited to have your own attorney sit in in this case.' He at that time did not see any necessity of that, but I told him he had better consider it further; but I heard nothing further from Mr. Nelson in that regard."

Mr. Watson's testimony met with no rebuttal.

The case was tried, resulting in a $10,000 verdict for Hofmann. There was the usual motion made for judgment notwithstanding or new trial. It was denied, although the court expressed some hesitancy about the matter in its memorandum. Defendant deemed it inadvisable to appeal as there was some evidence upon which the verdict could be sustained. The case was later settled for $9,500, of which defendant paid its full policy limit of $7,500, plaintiff paying the remaining $2,000; and it is for the recovery of this sum the present suit was brought. The complaint is founded upon the theory that—

"defendant wilfully, dishonestly, in bad faith, and in violation of its duty to the plaintiff, failed and refused to effect a settlement of said suit  *  *  *  but acting wilfully, dishonestly, in bad faith, and in violation of its duty to this plaintiff, failed to notify the plaintiff of defendant's ability to settle said action for the sum of six thousand ($6,000) dollars or seventy-five hundred ($7,500) dollars, respectively, at the times hereinbefore described, and wilfully, dishonestly, in bad faith, in violation of its duty to plaintiff, and with intent to deceive this plaintiff, and to coerce plaintiff to contribute towards a settlement, requested and demanded the plaintiff to contribute fifteen hundred ($1,500) dollars towards a settlement of said action,  *  *  *"

Plaintiff's contractual liability must necessarily be determined by the terms of the policy. Nowhere therein does defendant agree to settle and pay *any judgment,* or to indemnify plaintiff against *any amount* that might be recovered against it. The specified limit is $7,500 plus the cost of defending the litigation. All that has been

met and paid by defendant. Nor is there any suggestion of defendant's failure adequately to investigate the facts of the case and to prepare it thoroughly for trial. The pleadings and testimony in the Hofmann case have been carefully read. That case was tried with a high degree of efficiency. The most that can be said for the plaintiff in that case is that there was enough evidence to go to the jury on the questions of McDonald's negligence, Hofmann's contributory negligence, and the proximate cause of Hofmann's hurt. The case was a close one upon the facts. Under such circumstances and taking at full worth the testimony of Mr. Nelson, how can it be said by anyone that the case is one of "clear" liability? (Compare Mendota Elec. Co. v. New York Ind. Co. 169 Minn. 377, 211 N. W. 317.)

We think defendant's conduct of the case from beginning to end bespeaks good faith on its part and that it acted upon reasonable grounds in proceeding as it did. After all, the probabilities and even the possibilities were as well known to the plaintiff as to the defendant. Both parties had full knowledge of all the facts. Plaintiff's proof does not even suggest that it was misled by reason of any suppression of facts on the part of defendant nor of any fraud being practiced by it. The most that can be said about the whole situation retrospectively is that Mr. Watson's judgment was better than that of Mr. Sawyer's, i. e., it would have been better for all concerned if the proposed settlement had been made effective. But, after all, no mortal has the gift of prophecy. Insofar as any standard of due care could be applied to the exercise of honest judgment, we think the result justifies no other conclusion than that reached by the trial court. Here, as in Mendota Elec. Co. v. New York Ind. Co. 175 Minn. 181, 184, 221 N. W. 61, 62:

"It takes something more than mere mistake to constitute bad faith, particularly with respect to the action of an insurer under a policy of public liability which is not absolutely bound to make a settlement. The right to control negotiations for a settlement must of course be subordinated to the purpose of the contract, which is to indemnify the insured within the contract limit. But it takes

something more than error of judgment to create liability. *There must be bad faith with resulting injury to the insured before there can be a cause of action.*" (Italics supplied.)

Plaintiff seeks to make capital out of certain reinsurance procured by defendant; also that it had increased its reserve account as to this policy. We do not consider these items at all material to the main issue, which in our view compels affirmance of the court's order.

Affirmed.

