## QUINTEN G. LARSON v. ANCHOR CASUALTY COMPANY.

82 N. W. (2d) 376.

April 5, 1957—No. 36,940.

*Thoreen, Thoreen & Lawson,* for appellant.

*Meagher, Geer, Markham & Anderson, O. C. Adamson II,* and *David W. Nord,* for respondent.

NELSON, JUSTICE.

Action against automobile liability insurer to recover excess amount not paid on a judgment heretofore obtained by one Thomas A. LeTourneau in a negligence action against the insured, Quinten G. Larson, plaintiff herein. Plaintiff charges insurer with bad faith upon several grounds but particularly with respect to its rejection of a settlement offer held open shortly prior to and during the trial of LeTourneau's suit against Larson. Larson is a farmer 45 years of age, married, and residing near Marine on the St. Croix, Washington County, Minnesota.

It appears that on June 24, 1951, while policy of Anchor was in full force and effect, Larson, the insured, while driving his automobile collided with the automobile of LeTourneau on a graveled township road. The collision resulted in severe personal injuries to LeTourneau and damage to his automobile. As required by the policy, Larson reported the accident to Anchor and its insurance agent, Wendell G. Johnson, a lawyer in a nearby town whom plaintiff had previously consulted on income tax items.

The policy contained the usual provisions as to coverage of bodily injury and property damage liability and other coverages afforded by the other terms of the policy. It also contained provisions with respect to defense, settlement, and supplementary payments. The aforesaid provisions were subject to the limits of liability, exclusions, conditions, and the other terms of the policy. The premium had been paid and the policy was in full force and effect. The bodily injury limits in said policy were $10,000 and $20,000, and property damage was limited for each occurrence to $5,000.

LeTourneau commenced suit against Larson for personal injuries and property damages in the amount of $90,000. The case was tried

before the district court and a jury in Washington County in March 1954. The jury rendered a verdict in favor of LeTourneau in the sum of $62,500. Larson moved for a new trial, which motion was denied. For reasons stated in Anchor's file, no appeal was taken, and Anchor paid the sum of $10,245.08 under its policy together with an additional sum of $1,775.20 on damage to LeTourneau's car. Anchor also contributed to the extent of 50 percent to a settlement of $5,000 of a claim on the part of Miss Rydeen, who had been a passenger in Larson's car and who was injured as a result of the collision, relieving Larson and LeTourneau therefrom. It thereby became evident that LeTourneau's insurer at least felt at the time that its insured was sufficiently at fault to pay one-half of the Rydeen claim.

The counts of bad faith upon which plaintiff relies are: That Anchor failed to investigate said accident in a full and careful manner; that it failed to call as witnesses persons who would have testified to facts which were favorable to Larson; that it failed to accept an $8,500 offer of settlement made by LeTourneau prior to and during the trial of his suit against Larson; and that it failed to sufficiently inform Larson of said offer of settlement, thus giving him an opportunity to accept the same. It is further claimed that Wendell G. Johnson, local lawyer, who had been insurer's agent in issuing the policy of liability insurance and who was supposed to be representing Larson, was in fact acting for Anchor as to the excess being demanded beyond the limits of the policy and in bad faith failed to demand from Anchor in Larson's behalf that it accept the offer of settlement. Another item of bad faith charged against Anchor was that its counsel failed to thoroughly cross-examine LeTourneau's doctors relative to his injuries and failed to bring out at the trial that LeTourneau had been severely injured in a previous accident.

Plaintiff called as witnesses Dennis D. Daly and John S. McGrath, who had been counsel for LeTourneau in the suit against Larson, Kenneth B. Jones, branch claims supervisor for Anchor, who was in charge of adjusters, followed by Larson and Wendell G. Johnson,

who had as agent sold the policy to Larson. The case file of Anchor was made available through cross-examining Jones as an adverse witness and, except for certain items held to be immaterial, was received in evidence. This constituted the additional testimony upon which plaintiff relied to establish Anchor's bad faith as a basis of liability for LeTourneau's recovery in excess of the policy limits.

We fail to find wherein Anchor did not make an ordinarily prompt and proper investigation. The accident occurred June 24, 1951, at 6:45 p. m. It was reported promptly by Larson to insurer and the Johnson agency. On the next day, the 25th, Anchor obtained signed statements from plaintiff and statements from plaintiff's wife and from LeTourneau the driver of the other car, were taken with the aid of a court reporter. On the 26th, Anchor obtained an additional signed statement from Larson, and on that date Larson executed his "first report" form.

In addition Anchor's investigator interviewed the county sheriff and one Fred Natt, the only witness which Larson had mentioned prior to July 19, 1951. Wendell G. Johnson went to view the scene of the accident the same night after receiving notice from Larson. The investigator had also discussed the matter with LeTourneau's insurer and LeTourneau's attorney prior to July 19, 1951.

Both the record and the file indicate that within 24 hours following the accident all eyewitnesses except Miss Rydeen, who was the girl passenger in Larson's car, had been interviewed. As soon, however, as her attorney settled her claim against LeTourneau and Larson, Anchor interviewed her and obtained her statement, which was mostly negative. Following suit by LeTourneau October 21, 1953, Anchor obtained statements from three other persons following pretrial investigation: Charles Ancke, Larson's brother, and Edwin L. Whalen, all of whom had come upon the scene after the accident, and again interviewed Fred Natt, the other accident-scene witness. In addition, Wesley Carlson and Wendell G. Johnson, accident-scene witnesses, were interviewed, and as to LeTourneau, both a retail credit report and a physical examination were obtained.

344

At the trial of LeTourneau's suit against Larson all witnesses, generally substantiated Larson's version that he was struck on his own side of the road while traveling at what was deemed to be a reasonable speed. Furthermore the testimony of these same witnesses either indicated that LeTourneau was driving at a greater speed over a hill crest on Larson's side of the road facing the sun, or their versions of the situation were negative and neither substantiated nor contradicted Larson. LeTourneau to substantiate his claim testified to the contrary, claiming that Larson was speeding and traveling on the wrong side of the road. Viewing the record as a whole and Anchor's file, it does not appear that at any time before the jury verdict was reported Anchor was without reasonable or probable cause in seeking to vindicate Larson's position that he was without fault or Anchor's position that it was not obliged to pay or settle. It could reasonably look forward to a probable result of either vindicating Larson completely or holding both drivers negligent as had been indicated by LeTourneau's insurer when joining in and contributing toward the settlement of Miss Rydeen's claim as passenger in plaintiff's car, together with other settlements later to be mentioned.

Counsel for Anchor, in his report to his client following the trial of LeTourneau v. Larson, said regarding the outcome of the trial:

"It is difficult, if not impossible, for me to understand the action of the jury in this case, as the trial turned out much more satisfactory from the defendant's standpoint than I anticipated at the beginning of the trial. We had no surprises during the trial; there were no witnesses called by the plaintiff that we did not anticipate, with one possible exception, that being the brother-in-law of the plaintiff; and the witnesses of the defendant developed to be far better witnesses than I had anticipated prior to the trial."

It appears from this report that LeTourneau was the only witness who testified in his behalf as a witness to the accident, and he was also the only witness testifying on his side as to the position of the Larson automobile or his own automobile at the time of the collision. His wife was called to testify, but she had come to the

scene of the accident some time after it occurred. A brother-in-law of LeTourneau who had brought his wife to the scene of the accident some time after its occurrence also testified, and LeTourneau's accident-scene witnesses testified that his car was on its right side and facing in the direction in which it had been proceeding prior to the collision. All Larson's accident-scene witnesses testified that the Larson car was on its right side of the highway and that the LeTourneau car was on the center and half over to the left of the center of the highway, the Rydeen girl stating that when she got out of the Larson car on its right side it was right next to the bank on the right side. Thus there was a conflict as to the position of the cars following the occurrence of the collision.

Counsel for Anchor further indicated by his report that all accident-scene witnesses interviewed in behalf of the defense appeared and testified favorably as to Larson's driving speed and the position of his automobile upon the highway following the collision and before the cars were moved. When Larson was cross-examined by Anchor's counsel in the present suit, he was asked the following questions to which he gave the following answers:

"Q. Has it not been your position, Mr. Larson, all through all of this litigation that you were not in any way to blame for that accident?

"A. Well, that would be an argument between me and Mr. LeTourneau, I would say.

"Q. But your side of that argument is, 'LeTourneau, I wasn't at all to blame, but you were.'

"A. Naturally.

"Q. Yes. You took that position honestly, didn't you?

"A. I believe so.

"Q. When you signed the first report a day or two after the accident, it asked you if you considered yourself to blame for the accident, and you said, 'I do not.'

"A. Yes, sir.

"Q. Then it says, 'Why?' You said, 'The other car was over the center line, and I was about as far to the south or right side of the

road as I could get. I had my car under control and I don't believe that the other driver did.' You meant honestly to say, 'I wasn't to blame for that accident,' didn't you?

"A. Well, that's the way it appeared to me. I could have been wrong, of course."

According to the record this is the first time he waivered in any way relative to the position he had taken from the time of the occurrence of the collision and maintained throughout the LeTourneau trial that he was "not in any way to blame for that accident." Only when testifying against Anchor did he volunteer that he "could have been wrong, of course."

LeTourneau's insurer had, before the matter came to trial, seen Larson, voluntarily made him an offer which he accepted, and paid him $800 damages on his car and $400 for scratches or bruises Mrs. Larson had suffered to her head. Larson's testimony as to this settlement indicates that he had maintained that he was "not to blame."

Larson received a letter from Anchor dated October 26, 1953. LeTourneau had sued Larson October 21, 1953. This letter informed Larson that the limits of liability under his policy for one person was the sum of $10,000, and that Thomas LeTourneau had brought suit for $90,000 which was considerably in excess of the coverage afforded under the policy issued to him. Anchor then concluded the letter as follows:

"The purpose of this letter is to acquaint you with the fact that your personal interests are involved in this litigation so that you may, if you desire, retain counsel of your own selection and at your own expense to represent your personal interests. In such an event we will be happy to provide these attorneys with our full cooperation. "We are proceeding with the investigation and defense of the above litigation but no action taken by the Anchor Casualty Company, its agents, servants or attorneys in conducting this investigation or defense should be construed as in any way amending, altering or enlarging the coverage afforded to you under the policy issued by the Anchor Casualty Company."

Larson in the month of January 1954 mortgaged all his personal property to his brother. He makes no claim that Anchor was in any way responsible for his decision in that respect.

Larson has complained of not understanding and getting the full import of the letter of October 26, 1953, advising him that the LeTourneau suit was in excess of the policy limits and that for his own protection in that respect he was free to seek and hire counsel to separately represent his own interests. The record indicates that he was cautioned to do this by Anchor's representative when in conversation with him.

On July 10, 1951, he wrote the following letter to Anchor and received the following reply:

"Dear Sir:

"Would you please inform me of any developments, if there are any in the accident my car figured in and Tom LeTourneau on Sunday evening June 24, 1951.

"I have some new evidence that was overlooked at the time of the accident; If you would care to have it you could contact me.

"I would be much oblidged if you would inform me the name and address of the company Mr. LeTourneau had his automobile insured with. Also the type of insurance he carried. Mr. LeTourneau would not give me this information when I asked him for it, and the adjuster for his company did not leave me the information either, when he was here."

"Dear Mr. Larson:

"In regard to your accident of June 24, 1951, as you know Mr. LeTourneau has hired an attorney to sue you for damages arising out of this accident. We, therefore, need all the information we can assemble to properly defend you. We, therefore, request that you have the enclosed witness report forms completed by your neighbor, Mr. Natt, and your brother. We are particularly interested in obtaining information as to the position of the skid marks of the two cars and the position of the cars after the accident. We have enclosed an envelope with our address for your convenience."

Dennis D. Daly, one of the attorneys for LeTourneau, was asked on cross-examination by counsel for Anchor for his views on the conduct of the defense by its counsel and answered favorably in every respect as to trial ability, experience, and integrity of said counsel, stating that he did not know of any fact or argument that was not used in the defense of that case; that he thought defense counsel had covered the subject completely. Anchor's counsel had asked Wendell G. Johnson to sit in on the case, which he did, thinking that the latter would represent Larson's interests. Larson, however, while consulting with Johnson and enlisting his aid in suggesting settlement and rounding up the witnesses the day before the trial, made it clear to Anchor's representative before trial that he was not hiring Johnson as his lawyer and exacted assurances that he would not have to pay for his time or services nor the expense of the attendance of witnesses. Since Johnson had been the agent from whom plaintiff obtained his policy of insurance, Johnson was not called as a witness although he had gone to the scene of the accident the evening it occurred following Larson's report to him. His testimony could only have been cumulative of what other accident-scene witnesses testified to, and Anchor's counsel therefore decided that under all the circumstances it would be better strategy not to call him. Counsel was faced with the necessity of exercising his best judgment upon that matter while the trial was in full progress.

Larson, while testifying against Anchor, stated in effect that he did not question Johnson's honesty or integrity in any connection he may have had with the LeTourneau case. Larson had appeared most concerned generally lest he would have to pay for legal representation and expenses on his own part. Since he had declined to follow their suggestion of providing his own legal representation as to any excess claim above the limits of the policy, one of his main concerns was that all of such expenses should be borne by Anchor. Anchor's last warning to Larson on that score came in a letter to Wendell G. Johnson dated March 4 and received March 8, the day before the trial. Larson was immediately notified of receipt of the letter and thereupon reported in person to Johnson's office. He was

then given the details, including notice of an offer of settlement which he thereafter asked Johnson to urge upon Anchor both that day and at the opening of the trial, which request Johnson complied with. Larson had never receded from his position that he was not to blame. Larson, however, was reluctant to aid in rounding up his witnesses as requested by Anchor. Johnson urged him to meet this requirement and later assisted him in arranging for the attendance of his witnesses. Based on Larson's continued and what appeared to be his honest denial of liability, joined in by his wife and supported by accident-scene witnesses, Anchor chose to defend and rejected LeTourneau's offer of settlement.

Larson admits that in LeTourneau's trial against him he testified to the fact that in his judgment and honest conviction at the time he was not to blame for the accident. Of course, if this was true neither Larson personally nor his insurer, Anchor, would be obligated to pay damages, at least until a jury as the factfinding tribunal upon some sustainable ground disagreed with Larson and his witnesses upon the facts and found otherwise. Larson never suggested or admitted before his appearance as a witness in the case at bar that the matter of who was to blame for the accident was a disputable or debatable question. It does not appear that he ever pressed this as a reason at any time why Anchor ought to compromise or settle LeTourneau's claim against him.

■ We think that both Anchor's files and the record as a whole in the instant case are without sufficient evidence whereby the good faith of Anchor as the insurer might be impugned. Plaintiff did not himself permit the inference that he might be wrong until after he was faced with the excess verdict. LeTourneau's insurer, by its attitude in settlements made both with plaintiff and on the Rydeen claim, at best indicated that LeTourneau might also be in the wrong. LeTourneau practically stood alone as a witness in claiming that he was in the right. Nevertheless, we have kept in mind the rule, and given due recognition to it, that it is the duty of the insurance company to exercise good faith toward the insured, both in the investigation under a liability policy and in the defense of the law-

suit and in the payment of its obligations under the insurance contract. We cannot, however, disregard Anchor's right to defend in an action where reasonable and probable cause for making the defense exists.

We are forced to reject, upon the record herein, Larson's claim that he became the victim of bad faith by any act or conduct on the part of Anchor, the insurer, or that in its exercise of its right to defend it knowingly or intentionally did so against his interests. It seems only fair to assume from all the facts which the record discloses that the probabilities as well as the possibilities were as well known to the plaintiff as to his insurer and that both plaintiff and defendant, in ample time, had full knowledge of all the facts. As was said by Judge Sanborn in the recent case of Frank B. Connet Lbr. Co. v. New Amsterdam Cas. Co. (8 Cir.) 236 F. (2d) 117, 127:

"It seems safe to say that it would be an unwholesome rule which would permit a liability insurer to be convicted of bad faith for having failed to compromise a personal injury action, justifiably believed by it to be without merit, if the plaintiff in the action should obtain a verdict and judgment against the insurer in excess of its policy liability. Such a rule would virtually have the effect of giving an insured under a limited liability policy unlimited coverage."

In Farm Bureau Mutual Auto. Ins. Co. v. Violano (2 Cir.) 123 F. (2d) 692, 696, certiorari denied, 316 U. S. 672, 62 S. Ct. 1043, 86 L. ed. 1747, it was held that:

"* * * so long as it acts in good faith, considering the interests of the insured as well as its own interest, and not capriciously, an insurer cannot be required to settle a case rather than to litigate a doubtful issue, nor to bear the financial burden imposed on the insured if ultimate liability should exceed the policy limit."

In Southern Fire & Cas. Co. v. Norris, 35 Tenn. App. 657, 668, 250 S. W. (2d) 785, 790, the court pointed out:

"* * * The insurer is under no duty to compromise a claim for the sole benefit of its insured if to continue the fight offers a fair and reasonable prospect of escaping liability under its policy or of

getting off for less than the policy limit. The insured surrenders to the insurer the right to investigate and compromise or contest claims knowing that, in event of a claim, the insurer will have its own interests to consider. But an insurer also has a right to assume that his interests will not be abandoned merely because the insurer faces the prospect of a full loss under the policy. The relation is one of trust calling for reciprocity of action. The insured owes the duty of full co-operation—the insurer the duty of exercising good faith and diligence in protecting the interest of its insured."

Counsel for Larson at the time of the argument before this court cited a recent Oregon case, Radcliffe v. Franklin Nat. Ins. Co. 208 Ore. 1, 298 P. (2d) 1002, upon which he appeared to rely heavily in support of his claim that the question whether Anchor had acted in bad faith in rejecting LeTourneau's offer of settlement should have been submitted to the jury. We think this case distinguishable upon the facts. There had been a failure generally in that case to disclose facts which should have been made known to insured both before and during the trial. Counsel for the insurer, although he had expressed the opinion to its claim superintendent that he could not win the lawsuit and had predicted that the verdict might be $7,500 or $8,000 or possibly larger depending upon what the medical testimony at the trial might disclose, nevertheless had been left throughout the progress of the trial without authority either to negotiate or to settle and was ordered by the claim superintendent over the telephone to proceed with the trial to the end. Moreover, the insurer's claim superintendent failed to show up contrary to previous arrangements, went to attend another trial, and the trial resulted in a verdict in plaintiff's favor carrying an excess of $10,000 over the policy limits. While the trial court in the action against the insurer to recover the excess directed the jury to return its verdict for the insurer, the Oregon court on appeal said (208 Ore. 20, 298 P. [2d] 1011):

"We think that the evidence could warrant findings by the jury that (1) the omission to negotiate for a settlement was due to the fact that the insurer had no one at the trial empowered to discuss

the subject, and (2) the financial interests of the Radcliffes were not considered when the insurer cast aside the settlement offer."

The comments which the court made in that opinion indicate the reason from the facts which inclined it to reverse, but it also warned that it did not intend to adjudicate that if the case had been submitted to the jury and if the latter had returned a verdict for the plaintiffs it could not be said by the court, as a matter of law, that the verdict lacked support in the evidence. The court, however, stressed the rule that the insurer owes a duty to inform the insured of the receipt of a settlement offer whenever an excess verdict is sought so that the latter may take whatever course may be necessary for the protection of his own interests in the event the insurer should reject the offer.

■ The record in the instant case provides ample proof that the insurer met the required duty of informing the insured of all developments preceding trial as well as LeTourneau's offer of settlement. While the insurer cannot disregard the plight of the insured where claims are made in excess of the coverage provided by the policy, the insurer cannot be held liable without proof of fraud or bad faith for having chosen lawfully and in good faith to defend under and pursuant to the provisions of the insurance contract.

In the case at bar, both counsel and other representatives of Anchor made the excess claim and the offer of settlement known to Larson in time to be acted upon, repeating the suggestion to him that he obtain a lawyer of his own choice to represent his own interests.

■ The subject here involved came under consideration in this state in Mendota Elec. Co. v. New York Ind. Co. 169 Minn. 377, 211 N. W. 317. The defendant had insured plaintiff in the sum of $5,000 against loss by reason of the liability imposed by law for damages on account of bodily injuries received by any one person not employed by plaintiff. It appeared that the insured was clearly liable. Suit was brought against three defendants. The insurer, although cognizant of its liability to the plaintiff under the terms of the policy, refused to contribute the full amount apportioned to

it under a settlement offer, thereby leaving the sum of $1,125 to be paid by the insured in order to effect the settlement. This court held that the settlement of the claim of the injured party was prima facie evidence of liability and the amount thereof and laid down the rule that where the insured is clearly liable and the insurer, after undertaking the defense of the action, refuses to make a prudent settlement unless the insured contributes a portion of the amount required, the refusal must be made in good faith and upon reasonable grounds for the belief that an excessive amount is demanded for a settlement and reversed an order sustaining a demurrer to the complaint in an action to recover the excess. This court in reaching its conclusion did so upon the premise that, where pursuant to the terms of the policy the insurer takes charge of the defense and has the exclusive right to settle, it is possible to coerce the insured into contributing part of the sum required to effect a settlement in order to avoid the risk of a recovery in excess of the indemnity given by the policy. However, in doing so, good faith and fair dealing must be recognized as correlative obligations, since the insurer owes to the insured some duties in the matter of the settlement of claims covered by its policy, and if the liability is clear, the refusal to pay less than the limit of the policy in settlement must be made in good faith and upon reasonable grounds for the belief that the amount required to effect such settlement is excessive. Upon reversal, plaintiff became entitled to have its claim for reimbursement determined on the merits.

The trial which followed resulted in a verdict for plaintiff, the defendant moved for a directed verdict and thereafter for judgment notwithstanding the verdict. Both were denied by the trial court, and the matter again came before this court. Mendota Elec. Co. v. New York Ind. Co. 175 Minn. 181, 221 N. W. 61. This court reversed on the ground that, finding no evidence of bad faith in the record before it, it was constrained to hold that there was no basis for the verdict and ordered judgment for defendant. In doing so the court ruled that it takes something more than a mere mistake to constitute bad faith, particularly with respect to the action of an insurer under a policy of public liability by which it is not absolutely bound to

make a settlement; that the right to control negotiations for a settlement must be subordinated to the purpose of the contract, which is to indemnify the insured within the contract limit; that it takes something more than error of judgment to create liability; that bad faith in the refusal of an insurer to pay in settlement of a personal injury claim against its insured the maximum amount of its liability is not shown by a mere mistake as to the liability of a codefendant of the insured, and a consequent insistence, also mistaken, that the defendant should pay a stated amount which it refused to pay.

The question as to the bad faith of an insurer under a policy of public liability came before this court again in Lawson & Nelson Sash & Door Co. v. Associated Ind. Corp. 204 Minn. 50, 282 N. W. 481. In that case the policy limit was $7,500. The insurer refused to contribute beyond $4,500 toward a proposed settlement and the insurer was charged in plaintiff's complaint with wilfully, dishonestly, in bad faith, and in violation of its duty to plaintiff, and with attempt to deceive the plaintiff and to coerce plaintiff to contribute towards a settlement, requesting and demanding that the plaintiff contribute $1,500 towards a settlement. The trial court at the close of the evidence directed a verdict for defendant. This court in affirming the trial court reached its conclusions upon the same grounds as it had in Mendota Elec. Co. v. New York Ind. Co. 175 Minn. 181, 184, 221 N. W. 61, 62:

"* * * it takes something more than error of judgment to create liability. *There must be bad faith with resulting injury to the insured before there can be a cause of action.*"[1] (Italics supplied.)

In reaching the foregoing conclusions in the Lawson & Nelson case the court made the following comments (204 Minn. 56, 282 N. W. 483):

"We think defendant's conduct of the case from beginning to end bespeaks good faith on its part and that it acted upon reasonable grounds in proceeding as it did. After all, the probabilities and even

---

[1]Georgia Cas. Co. v. Mann, 242 Ky. 447, 46 S. W. (2d) 777; Zumwalt v. Utilities Ins. Co. 360 Mo. 362, 228 S. W. (2d) 750, citing Norwood v. Travelers Ins. Co. 204 Minn. 595, 284 N. W. 785, 131 A. L. R. 1496.

the possibilities were as well known to the plaintiff as to the defendant. Both parties had full knowledge of all the facts. Plaintiff's proof does not even suggest that it was misled by reason of any suppression of facts on the part of defendant nor of any fraud being practiced by it. The most that can be said about the whole situation retrospectively is that Mr. Watson's judgment was better than that of Mr. Sawyer's, *i. e.*, it would have been better for all concerned if the proposed settlement had been made effective. But, after all, no mortal has the gift of prophecy. Insofar as any standard of due care could be applied to the exercise of honest judgment, we think the result justifies no other conclusion than that reached by the trial court."

■ The earlier cases in this country on the subject matter here involved largely supported the rule that a liability insurer is under no duty to consider the insured's interest in accepting or rejecting a compromise offer. At present it appears that the majority of the courts hold that the insurer is bound to give some consideration to the insured's interest in such a situation. The decisions appear to split on the question of whether the insurer's obligation is only to act in "good faith" to the insured in considering such offer within the limits of the policy obligation, or whether it is required to exercise "due care" and is liable for a negligent rejection of the compromise. In many recent cases the two tests of "good faith" and "negligence" have tended to coalesce, with many of the courts which have in terms rejected the "negligence" test agreeing, nonetheless, that the insurer's negligence is a relevant consideration in determining whether or not the insurer exercised the requisite "good faith." It is clear that Minnesota has adopted the rule that a liability insurer, having assumed control of the right of settlement of claims against the insured, may become liable in excess of its undertaking under the policy provisions if it fails to exercise "good faith" in considering offers to compromise the claim for an amount within the policy limits.

We are clearly committed to the "good faith" test and that there must be bad faith with resulting injury to the insured before there can be a cause of action.

■ Where a conflict of interest arises between the insurer and the insured with respect to the action of an insurer under a policy of public liability wherein it has reserved the alternative right to defend or to make settlement, but where good faith and fair dealing are also correlative obligations between the insurer and the insured, a liability insurer is entitled to an honest statement by the insured and the insured to the insurer's good faith where accepting or rejecting a compromise offer is involved. A defense, however, showing reasonable and probable cause for rejecting the compromise offer vindicates the insurer's good faith, even though the defense is unsuccessful.[2]

We reach the conclusion in the instant case that Anchor had, under all the circumstances, reasonable and probable cause for rejecting the compromise offer; that its actions and conduct throughout the whole course of its proceedings in the LeTourneau-Larson controversy survive the good-faith test, there being no bad faith on the part of Anchor which resulted in injury to its insured.

The order appealed from denying Larson's motion to set aside the verdict directed below in favor of Anchor and granting to him a new trial is justified upon the record herein.

Affirmed.

[2]See, Hall v. Preferred Acc. Ins. Co. (5 Cir.) 204 F. (2d) 844, 40 A. L. R. (2d) 162, with Annotation at 168.