In re Linda Jean MATHEWS, Debtor.

John A. HEDBACK, Trustee, Plaintiff,

v.

AMERICAN FAMILY MUTUAL INSURANCE COMPANY, Defendant.

Bankruptcy No. 3–94–3419.
Adv. No. 3–95–049.

United States Bankruptcy Court,
D. Minnesota,
Third Division.

March 31, 1997.

Brian F. Kidwell and Edward W. Gale, St. Paul, MN, for Plaintiff/Trustee.

Steven J. Kluz, Minneapolis, MN, for Defendant.

## ORDER GRANTING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

GREGORY F. KISHEL, Bankruptcy Judge.

This adversary proceeding came on before the Court for hearing on the Plaintiff's motion for summary judgment on Counts 2 and 4 of his complaint. The Plaintiff appeared by his attorneys, Brian F. Kidwell and Edward W. Gale. The Defendant appeared by its attorney, Steven J. Kluz. Upon the moving and responsive documents, the arguments of counsel, and the relevant files, records, and proceedings herein, the Court makes the following order.

## NAMED PARTIES, OTHER PARTIES AND THEIR RELATIONSHIP

The Debtor is a resident of Maplewood, Minnesota. On June 20, 1991, she was the driver of an automobile that was involved in a serious accident with two other automobiles in St. Paul Park, Minnesota. Seeking relief from her financial liability for that accident, the Debtor filed a voluntary petition under Chapter 7 of the Bankruptcy Code on July 27, 1994.

Brenda N. Carlson and Thomas J. Thompson were, respectively, the driver and a passenger in one of the other vehicles involved in the accident. They suffered severe neurological and other injuries that left them permanently and totally disabled.[1] They hold judgments against the Debtor as a result of the accident, both entered in June, 1994— Thompson's in an amount exceeding $7,000,-000.00, and Carlson's in an amount exceeding $3,600,000.00.

The Defendant is a corporation duly licensed and authorized to do to business as an insurance company in the State of Minnesota. On the date of the accident, the vehicle driven by the Debtor was insured under an automobile liability policy issued by the Defendant. After the accident, the Defendant undertook to defend and indemnify the Debtor, pursuant to that policy. In December, 1992, Carlson and Thompson received funds from the Defendant, the total of which equaled the limits of coverage under the policy. Then, by a written instrument dated June 30, 1993, the Debtor released the Defendant from all liability to her on account of the way it had handled the claims against her arising from the accident. The Debtor received $50,000.00 in consideration for the execution of this release.

The Plaintiff is the Trustee of the Debtor's bankruptcy estate. As such, he has certain statutory powers to avoid pre-petition transfers of the Debtor's assets; he succeeded to all nonexempt rights of action against third parties that the Debtor held as of the date she filed for bankruptcy; and he has a fidu-

---

1. For brevity, where reference is made to Carlson and Thompson collectively, they will be termed "the injured parties."

ciary obligation to pursue all such legal claims, as part of his obligation to collect nonexempt assets and to distribute them to the Debtor's creditors.

## NATURE AND HISTORY OF PROCEEDING

On March 29, 1995, the Plaintiff filed the complaint in this adversary proceeding. In it, he asserts two legal statuses: that of holder of creditors' avoidance powers, and that of successor to the Debtor as to pre-petition causes of action against the Defendant. The Plaintiff sets out four separate "causes of action" [2] in his complaint:

1. The Plaintiff states that the Defendant had an implied duty to exercise good faith and fair dealing with the Debtor in the handling and defense of the injured parties' claims. He asserts that it breached that duty, leading to the entry of large unsatisfied judgments against the Debtor. In consequence, he maintains, the Defendant is liable in damages to the bankruptcy estate.

2. On the premise that the June 30, 1993 release was a transfer to the Defendant of the Debtor's rights of action for "bad faith" against it, the Plaintiff asserts that the Defendant induced and received that transfer with actual intent to hinder, delay, or defraud Carlson and Thompson. Thus, the Plaintiff asserts, the release is subject to avoidance at his instance as a fraudulent transfer pursuant to 11 U.S.C. § 544(b) and MINN.STAT. § 513.44(a)(1).

3. In the alternative, asserting that the Debtor had not received reasonably-equivalent value for the release of her "bad faith" claims against the Defendant, at a time when the Defendant knew or reasonably should have known that the Debtor would incur debts beyond her ability to pay, the Plaintiff asserts that the release is avoidable as a fraudulent transfer under MINN.STAT. § 513.44(a)(2).

4. In the alternative to his fraudulent-transfer counts, the Plaintiff requests a declaratory judgment that enforcing the release would violate public policy, and that it is void as a result.

The Plaintiff acknowledges that he must prevail on one of the last three counts before he may proceed on the first.

By way of answer, the Defendant denies a number of the factual averments underlying the Plaintiff's causes of action. It then affirmatively defends on the grounds that the release, as a binding and enforceable contract, bars relief to the Plaintiff on his first cause of action, and that his second through fourth causes of action are unsupported in fact and/or law.[3] In its answer, the Defendant admits

> that this is a core proceeding under 28 U.S.C. § 157(b)(2)(H), however, [the Defendant] denies that this court has jurisdiction over all causes of action alleged in the complaint . . .

The Defendant clarified this assertion in an early motion for dismissal, in which it maintained that the Plaintiff's first cause of action would not be ripe until the Court had passed on the remaining counts. By an order entered on May 8, 1995, the Court denied that motion. All of the counts, then, went forward through discovery.

On motion of the Defendant, the Court determined that the Defendant has the right to a jury trial on the first, second and third counts, to the extent that they present triable fact issues. *In re Mathews*, 203 B.R. 152 (Bankr.D.Minn.1996).

## MOTION AT BAR

The Plaintiff now moves for summary judgment on Counts 2 and 4 of his complaint. As to the second count, he maintains that all

---

**2.** In the text of his complaint, the Plaintiff used the denomination "cause of action," rather than "count." For brevity's sake, the latter term will be used in this decision.

**3.** The former is appropriately classified as an affirmative defense, as it is among those enumerated in FED.R.CIV.P. 8(c), *incorporated by* FED.R.BANKR.P. 7008(a). The Defendant framed the latter theory with the language of FED.R.CIV.P. 12(b)(6), *as incorporated by* FED.R.BANKR.P. 7012(b)—so, technically, it is not an "affirmative defense."

of the evidence going to the Defendant's state of mind when she executed the release indicates that she did so with actual intent to hinder, delay, or defraud Carlson and Thompson. Thus, as the Plaintiff would have it, the transfer or extinction of rights of action that occurred via the release must be avoided, reinstating them to the bankruptcy estate. As to the fourth count, the Plaintiff notes that all of the transactional and legal circumstances surrounding the execution of the release are uncontroverted. Thus, he continues, the conformity of the release to public policy is purely an issue of law, and one that must end in the release being struck down. This, too, would reinstate the "bad faith" count to actionability by the Plaintiff.

The Defendant agrees that the fourth count is amenable to summary adjudication—though, of course, it argues for the opposite result on the merits. On the second count, however, the Defendant maintains that the record presents triable issues of material fact, which must be presented to a jury.

## DISCUSSION

### I. Standards for Summary Judgment

Motions for summary judgment, of course, are governed by FED.R.CIV.P. 56(c).[4] A motion under this rule can be presented to the Court in two different postures.

First, the parties can stipulate to a set of facts, and present their dispute on the legal consequences of those facts. If the stipulated facts go to all of the elements of the claim or defense at issue, the dispute is appropriate for summary adjudication. *E.g., W.S.A., Inc. v. Liberty Mut. Ins. Co.,* 7 F.3d 788, 790 (8th Cir.1993); *Coca–Cola Bottling Co. v. Teamsters Local Union No 688,* 959 F.2d 1438, 1440 (8th Cir.1992); *In re Schirmer,* 191 B.R. 155, 157 (Bankr.D.Minn.1996); *In re Atkins,* 176 B.R. 998, 1002 (Bankr. D.Minn.1994); *In re Sunde,* 149 B.R. 552, 554 (Bankr.D.Minn.1992); *In re Ramy Seed Co.,* 57 B.R. 425, 430 (Bankr.D.Minn.1985).

If the parties cannot agree to the identity and content of the material facts, another stage pushes into the inquiry. The elements of the claim or defense at issue must first be established—because the materiality of given facts turns on whether they go to those elements, as fixed under law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *In re Mid–City Hotel Assoc.,* 114 B.R. 634, 645 (Bankr.D.Minn.1990). Then, the evidence presented on the motion—generated by the parties' investigation and their discovery proceedings—must be reviewed closely, and linked to the appropriate element(s). To be cognizable under Rule 56, such evidence "must be significant" and "probative," *Johnson v. Enron Corp.,* 906 F.2d 1234, 1237 (8th Cir.1990), as well as "substantial," *Krause v. Perryman,* 827 F.2d 346, 350 (8th Cir.1987).

When a plaintiff is the moving party under Rule 56, it may amass all of the fruits of its investigation and discovery, and present them to the court. Then it may "point out," *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2553–2554, 91 L.Ed.2d 265 (1986), that that evidence supports only the factual theory of its own case, and supports neither the defendant's factual theory on the plaintiff's claim nor any pleaded affirmative defense. *In re Mathern,* 137 B.R. 311, 314 (Bankr.D.Minn.1992), *aff'd,* 141 B.R. 667 (D.Minn.1992).

If the plaintiff does this, the burden of production shifts to the respondent-defendant. That party can avoid a grant of adverse summary judgment only by producing evidence that would support findings in its favor on one or more of the elements of the plaintiff's case, or that would meet all of the elements of its affirmative defense. This evidence, too, must be significant, probative, and substantial. *In re Johnson,* 139 B.R. 208, 214 (Bankr.D.Minn.1992); *In re Mid–City Hotel Assoc.,* 114 B.R. at 645 n. 16. *See,*

---

**4.** This rule provides that, upon a motion for summary judgment,

> [t]he judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits [submitted with the mo-

tion], if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

It is incorporated into FED.R.BANKR.P. 7056.

*in general, In re Jolly's, Inc.,* 188 B.R. 832, 838 (Bankr.D.Minn.1995).[5]

If the defendant fails to meet its burden of production, the plaintiff must still demonstrate that it is "entitled to judgment as a matter of law"—that is, that the facts, as established by the evidence of record, satisfy all of the recognized elements of its claim. *In re Jolly's, Inc.,* 188 B.R. at 838.

## II. Substantive Issues

### A. "Bad Faith" Cause of Action

In a sense, the central claim in litigation here—that under Count 1—does not spring directly from the accident involving the Debtor and the injured parties. Rather, it is based on the Defendant's actions, or alleged inactions, as insurer, in response to claims made against the Debtor as a participant in the accident. Faced with the insufficiency of contractual liability insurance coverage to meet their clients' damages, the injured parties' attorneys early raised the specter of this separate claim. The implicit threat, of course, was substantial exposure to the Defendant, beyond the stated amount of coverage under its policy. The Defendant's aggressive effort to ward off this secondary liability resulted in the Debtor's release of the claim.

In a sense, the terrain of this dispute is an intangible one. It exists on the abstract plane of legal moves and counter-moves, and was created entirely by lawyers and courts.[6] Ultimately, as framed under Minnesota law, the central claim springs from a contract; it does not really sound under traditional principles of tort law. Its basic theory is abstruse enough, but the aspects of it that the Plaintiff argues to compel the avoidance of the release are even more so. Thus, some opening discussion of the theory of Count 1 is necessary, even though its merits are not before the Court in this motion.

For at least several decades, Minnesota law has recognized a cause of action in favor of insured parties, against insurers that refuse in bad faith to settle claims within the limits of coverage. *Short v. Dairyland Ins. Co.,* 334 N.W.2d 384 (Minn.1983); *Continental Cas. Co. v. Reserve Ins. Co.,* 307 Minn. 5, 238 N.W.2d 862 (1976); *Lange v. Fidelity and Cas. Co. of New York,* 290 Minn. 61, 185 N.W.2d 881 (1971); *Peterson v. Am. Family Mut. Ins. Co.,* 280 Minn. 482, 160 N.W.2d 541 (1968); *Boerger v. Am. Gen. Ins. Co. of Minnesota,* 257 Minn. 72, 100 N.W.2d 133 (1959); *Larson v. Anchor Cas. Co.,* 249 Minn. 339, 82 N.W.2d 376 (1957); *Iowa Nat'l Mut. Ins. Co. v. Auto–Owners Ins. Co.,* 371 N.W.2d 627 (Minn.App.1985). An early, succinct statement of the cause of action is found in *Larson v. Anchor Cas. Co.:*

> It is clear that Minnesota has adopted a rule that a liability insurer, having assumed control of the right of settlement of claims against the insured, may become liable in excess of its undertaking under the policy provisions if it fails to exercise "good faith" in considering offers to compromise the claim for an amount within policy limits.

82 N.W.2d at 386–387. To make out the cause of action, however, the insured must prove a level of culpability higher than simple negligence: ". . . there must be bad faith with resulting injury to the insured before there can be a cause of action." *Larson,* 82 N.W.2d at 387. Thus, an insurer may not be found liable under this cause of action for a mere error of judgment in its evaluation of whether its insured was liable in the first instance. *Id.*

The rationale for the cause of action includes two principles. First, a liability insurer has an inherent duty to exercise "good faith" as to its insured when, in carrying out

---

5. The *Jolly's* analysis is, of course, based on the Supreme Court's decisions in *Celotex Corp. v. Catrett* and *Anderson v. Liberty Lobby, Inc.,* as well as such decisions of the Eighth Circuit as *Firemen's Fund Ins. Co. v. Thien,* 8 F.3d 1307 (8th Cir.1993), *Heideman v. PFL, Inc.,* 904 F.2d 1262 (8th Cir.1990), and *City of Mt. Pleasant v. Assoc. Elect. Co-op., Inc.,* 838 F.2d 268 (8th Cir. 1988). The Supreme Court's decisions sprang from cases in which a defendant was using Rule 56 in a preemptive attack on a plaintiff's case. However, their rationale applies equally to a plaintiff's proactive use of the procedure. In such a context, it is particularly instructive in its burden-shifting analysis.

6. This character contrasts quite sharply with the all-too-tangible subject matter of the more typical personal-injury lawsuit.

its duty to defend, it assumes control over settlement negotiations. This duty "includes an obligation to view the situation as if there were no policy limits applicable to the claim, and to give equal consideration to the financial exposure of the insured." *Short v. Dairyland Ins. Co.*, 334 N.W.2d at 387–388; *Continental Cas. Co. v. Reserve Ins. Co.*, 238 N.W.2d at 863; *Lange v. Fidelity & Cas. Co. of New York*, 185 N.W.2d at 884. Second, when an insurer assumes such control, it "may become liable [to its insured] in excess of its undertaking under the terms of the policy if it fails to exercise 'good faith' in considering offers to compromise the claim for an amount within the policy limits." *Short v. Dairyland Ins. Co.*, 334 N.W.2d at 387. In the exercise of "good faith," the insurer must reasonably assess its and its insured's expectations of prevailing, and the anticipated amount of an adverse verdict, and then weigh the settlement offer against those expectations. *Herges v. Western Cas. & Surety Co.*, 408 F.2d 1157, 1164 (8th Cir. 1969) (applying Minnesota law); *Lange v. Fidelity & Cas. Co. of New York*, 185 N.W.2d at 884. In this weighing, it must give consideration to the interests of its insured that is at least equal to its consideration of its own interests. *E.g., Boerger v. Am. Gen. Ins. Co. of Minn.*, 100 N.W.2d at 136–137.

### B. Merits of Plaintiff's Motion

The release that the Debtor executed in favor of the Defendant was broad in form.[7] However, the Debtor and the Defendant both acknowledge that its main function was to surrender all of the claims against the Defendant that the Plaintiff pleaded as Count 1 of his complaint. The Plaintiff tacitly acknowledges that the release, once executed, constituted a valid and enforceable contract between its parties. As such, it bars the Debtor and any successor-in-interest from suing the Defendant under the "bad faith" cause of action. If the Plaintiff is to carry Count 1 forward, then, he must have the release set aside. Through the present motion, he maintains that he is entitled to a judgment for that relief, "as a matter of law." He proceeds under two alternate theories.

### 1. Count 4: Enforceability of Release, as a Matter of Public Policy

In the fourth count of his complaint, the Plaintiff seeks a declaratory judgment that the release is void and unenforceable, as contrary to public policy.

■ Both federal and state law recognize that courts have the power to declare contracts and agreements void as a matter of public policy. *In re NWFX, Inc.*, 881 F.2d 530, 538 (8th Cir.1989); *McBrearty v. U.S. Taxpayers Union*, 668 F.2d 450, 451 (8th Cir.1982); *AMCO Ins. Co. v. Lang*, 420 N.W.2d 895, 900 (Minn.1988); *Schmidt v. Clothier*, 338 N.W.2d 256, 260 (Minn.1983); *United Steelworkers of America, Local 6115 v. Quadna Mtn.*, 435 N.W.2d 120, 122 (Minn. App.1989); *Wille v. Farm Bureau Mut. Ins. Co.*, 432 N.W.2d 784, 787 (Minn.App.1989). The Bankruptcy Court may exercise this power. *E.g., Mark J. Kaufman, P.A. v. Howell, Milton & Liles*, 127 B.R. 898, 900 (Bankr.N.D.Fla.1991).

■ However, given the deference to freedom of contract under Anglo–American law, the courts should exercise this power sparingly, saving it for situations where "the preservation of the public welfare imperatively so demands." *Hart v. Bell*, 222 Minn. 69, 23 N.W.2d 375, 377 (1946).

> Before a charge of invalidity should be upheld, either law or precedent should mark out clearly that a particular contract violates public policy, or at least a court of justice should with certainty be able to say that enforcement of the contract would be hurtful to the public welfare. This is not a field for the play of individual notions of public policy. Rather it is only those indisputable public interests standing in opposition to what the contract seeks to accomplish that should be permitted to strike down its enforceability.

---

7. By its terms, the release covered any and all claims that [she] might have [had] against [the Defendant], of any nature and kind whatsoever, including, but not limited to, claims arising under or out of any policy of liability insurance under which [the Debtor was] an insured issued by [the Defendant], and claims made under such policy or policies relating to the accident of June 20, 1991.

*Perkins v. Hegg*, 212 Minn. 377, 3 N.W.2d 671, 672 (1942). A reviewing court, then, must be able to frame a recognizable public policy before voiding an agreement as unenforceable. *McBrearty v. U.S. Taxpayers Union*, 668 F.2d at 451.

■ Ultimately, this presents an issue of law. The Plaintiff and the Defendant have acknowledged all of the basic facts that constitute the circumstances under which the Debtor executed the release, and the terms of their agreement. These facts frame up the controversy, which is the agreement's consequences under law. That, of course, is an issue for the court, which need not sit as a finder of fact to address it.[8]

Those facts, material to Count 4, then, are:

1. The subject accident occurred at an intersection in St. Paul Park, Minnesota, on June 20, 1991.

2. At the time of the accident the Debtor was driving a vehicle owned by one Barbara Martinez. Martinez had obtained a policy of liability insurance coverage for the vehicle from the Defendant.

3. The coverage under the policy was limited to $50,000.00 per person and $100,000.00 per incident.

4. As she approached the intersection, the Debtor failed to obey a stop sign. In the intersection, she collided with a vehicle driven by Carlson on the cross-street. Thompson was a passenger in Carlson's vehicle. The Debtor then collided with a second vehicle driven by one Brian Fangel.

5. In the accident, Carlson and Thompson suffered severe injuries to the head and other areas. As of July 15, 1991, they remained in comas as a result of their injuries.

6. In the accident, Fangel had five teeth knocked out and suffered lacerations to his mouth and chin.

7. In a "16 point" report prepared on July 15, 1991, an adjuster/casualty claims representative employed by the Defendant noted the severity of the injuries suffered by Carlson and Thompson. She recognized the fact that their special damages had already exceeded $100,000.00 each. She then assessed "the majority of negligence" for the accident as being attributable to the Debtor, due to the Debtor's failure to stop at the sign or to yield to the other two drivers, who had had the right of way. Given those circumstances, she assessed "zero percent negligence" to Carlson and Fangel. She noted that some fault might be assessed against the owner of a fourth vehicle, which was illegally parked in a way that partially blocked the Debtor's view of the stop sign.

8. In an August 7, 1991 update to this report, a branch claims manager employed by the Defendant remarked:

> [The adjuster] did a nice job investigating this one. Even with contribution, our limits are gone.

9. Through court proceedings, guardians were appointed for both Carlson and Thompson. The guardians retained counsel to handle personal-injury claims for their wards— David W. Thurston for Carlson, and William D. Harper for Thompson.

10. The Debtor retained Todd P. Young to defend her in any criminal proceedings that might be commenced as a result of the accident. Young also undertook to represent

---

**8.** This characterization shows the error in one of the Defendant's subsidiary arguments against invalidating the release. As the Defendant points out, under Minnesota law the party challenging the validity of a release bears the burden of proof, *Johnson v. St. Paul Ins. Cos.*, 305 N.W.2d 571, 573 (Minn.1981), and to prove up grounds for invalidation it must meet a heightened quantum of clear and convincing evidence, *Yocum v. Chicago, Rock I. & P. Ry. Co.*, 189 Minn. 397, 249 N.W. 672, 675 (1933); *Gendreau v. N. Am. Life & Cas. Co.*, 158 Minn. 259, 197 N.W. 257, 258 (1924); *Carlson v. Elwell*, 128 Minn. 440, 151 N.W. 188, 190 (1915). The latter three cases, however, spoke to pleaded grounds of fraud,

mutual mistake, and incompetency. Intrinsically, all of these theories present questions of fact surrounding the formation of an agreement. By contrast, once it is established as a matter of fact that an agreement was knowingly and validly executed, the determination of its consequences for public policy is ordinarily an issue of law. *Steele v. Drummond*, 275 U.S. 199, 204–205, 48 S.Ct. 53, 54, 72 L.Ed. 238 (1927); *Branch v. Mobil Oil Corp.*, 772 F.Supp. 570, 571 (W.D.Okla.1991). Cf. *RJM Sales & Marketing, Inc. v. Banfi Prod. Corp.*, 546 F.Supp. 1368, 1375 (D.Minn.1982) (enforceability of contract alleged to be unconscionable is question of law properly decided on summary judgment).

her on the matter of her civil liability, in excess of the amount for which the Defendant's policy would furnish indemnification.

11.   In a letter to the Defendant's adjuster dated December 11, 1991, Harper stated that Thompson

> ... ha[d] been essentially in a coma since this accident and ha[d] damages that easily exceed[ed] $3 million dollars [sic]. Because of his status as a passenger he [was] totally fault free and the only issue [was] as to the coverage or coverages in question.

He demanded that the Defendant furnish proof of the amount of coverage under Martinez's policy, and then prove by affidavit and financial statement that the Debtor and Martinez had no other insurance coverage or "any financial assets" to further satisfy his client's claim.   Making a reference to "our agreement to accept [the Defendant's] meager policy limits," without specifying the dollar-amount of his demand, he stated:

> ... our offer to settle this matter will remain open for a period of only 30 days. At the conclusion of 30 days we will definitely and absolutely refuse any and all monies offer [sic] to us and look to your company for any excess verdict pursuant to *Short v. Dairyland.*   I trust you will guard yourself and your insureds accordingly.

12.   Under cover of a letter dated December 17, 1991, Young provided Harper with the proof of coverage and financial affidavit. In the letter, the Debtor attested to the fact that she had "no assets except for [her] clothing and personal possessions which [had] minimal value," was not employed, and rented her current dwelling.

13.   In a letter dated February 12, 1992, the claims representative advised Harper:

> ... we are agreeing to pay our $100,000.00 policy limits.   However, in order to do so, we must protect the interests of our insured and the driver of our insured vehicle, [the Debtor].   In order to do so, the policy limits must be distributed in a manner

agreeable to all parties who have or may have a bodily injury claim against our insured's policy.   At this time, the parties involved in potential claims are ... Thompson, ... Carlson, Trevor Thompson, ... Fangel, and Lance Mathews.[9]

> Upon receipt of signed releases, for agreement to disburse policy limits, by the parties involved, we will immediately release the monies.

14.   In a letter to the Defendant's claims representative dated February 27, 1992, Thurston referred to Harper's demand and the Defendant's response.   He stated that "it appear[ed]" that the Defendant was "taking the same position in reference to [Carlson's] right to the other $50,000.00 in liability insurance coverage."   He then demanded that, within thirty days, the Defendant either pay his client $50,000.00, or "[c]ommence legal proceedings in the District Court and deposit the $100,000.00 in liability limits with the Court."   He then stated:

> My offer to settle my client's claims in this matter for the sum of $50,000.00 with your insureds will remain open for a period of thirty (30) days.   At the conclusion of thirty days, if either of the above requirements are not complied with, my client will refuse any and all monies offered to us and will look to your company for any excess verdict.

15.   In a letter to the Defendant's claims representative dated March 3, 1992, Young requested that the Defendant "compl[y] with the dictate of David Thurston."   He also expressed his opinion that his "client ha[d] exposed [sic] to an excess verdict if settlement is not reached to protect her interest."

16.   On April 14, 1992, the Defendant filed a petition in the names of the Debtor and Martinez in the Minnesota State District Court for the Tenth Judicial District, Washington County.   In it, the Defendant sought leave to deposit $100,000.00 into that court in light of its "doubt [as] to the relative rights of the claimants to the ... [Martinez] policy."

**9.**   Trevor Thompson was Thompson's and Carlson's infant son and was a passenger in the Carlson vehicle.   Lance Mathews (who was not related to the Debtor) was a passenger in the Fangel vehicle.

17. On May 8, 1992, the Washington County District Court entered an order allowing the deposit of funds.

18. In late September, 1992, Harper and Thurston served motions for orders directing the disbursement of $50,000.00 plus accrued interest to each of their respective clients, out of the funds on deposit. October 9, 1992 was set as the hearing date for both motions.

19. Via a letter to the presiding judge, and then a formal filed memorandum, attorney Joseph H. Rivard, representing Fangel, objected to the motions. He stated that his client did not yet know the full extent of dental reconstruction work he needed, and argued that relegating his client to satisfaction from the insurer for the owner of the parked vehicle might not give him fair or adequate recourse. He urged that, at minimum, a $10,000.00 reserve be held for Fangel out of the deposited funds.

20. The presiding judge heard argument and took the matter under advisement. On December 12, 1992, he entered an order granting the relief that Harper and Thurston had requested.[10]

21. At some point, probably soon thereafter, the deposited funds were distributed in even shares to Harper and Thurston for their clients' benefit.[11]

22. In April, 1992, Harper and Thurston commenced personal-injury lawsuits on behalf of Carlson and Thompson against the Debtor, Martinez, and others, in the Minnesota State District Court for the Second Judicial District, Ramsey County.

23. The Defendant retained the law firm of Lommen, Nelson, Cole & Stageberg to represent it for these lawsuits. Attorney Linc Deter of the firm was assigned to the files.

24. At some point in early 1993, the Defendant retained the law firm of Rider, Bennett, Egan & Arundel to represent it in connection with issues arising out of the acci-

dent. Attorney Eric Magnuson of the firm took responsibility for these matters.

25. In the late winter or early spring of 1993, Deter and Young began negotiations over the issue of the Debtor's and the Defendant's mutual rights and duties under Martinez's policy. These issues had been raised by the way in which Harper and Thurston had issued their demands on the Defendant, and the manner in which the Defendant had responded to them.

26. Magnuson soon took over these negotiations. In early June, 1993, he and Young arrived at an agreement under which:

a. The Debtor would release the Defendant from all liability it might have to her, arising out of the accident, and in particular any liability to her for the way in which it had handled Carlson's and Thompson's claims and demands;

b. The Defendant, having paid the limits of coverage under the Martinez policy into court and ultimately to Carlson and Thompson, would no longer defend the Debtor in the personal-injury lawsuits, and Deter would withdraw as her counsel; and

c. The Debtor would receive $50,000.00 in cash in consideration for the release.

27. On June 30, 1993, the Debtor signed the release and received the funds. After paying a $20,000.00 contingent fee to Young, she used the balance as part of the purchase price for a house.

28. Harper and Thurston continued to prosecute the personal-injury lawsuits. Thompson's was tried to the court on November 17, 1993; Carlson's was tried to the court on June 16, 1994. At both trials, Young represented the Debtor.

29. On February 10, 1994 and June 20, 1994, the Ramsey County District Court ordered entry of judgment for, respectively, Thompson and Carlson, based on findings that the percentage of causal negligence at-

---

10. Neither party put a copy of this order into the record for this motion. The Defendant's counsel attached a copy of it to his earlier motion for dismissal. There are enough references to it in the deposition transcripts on file that its entry is established for the purposes of this motion.

11. Neither side directly proved this up, but it is clear from the overall record that it happened.

tributable to the Debtor was 100 percent. Judgment was entered for each, in favor of Thompson in the amount of $7,044,240.07 on June 14, 1994, and in favor of Carlson in the amount of $3,640,771.00 on June 30, 1994.

30. The Debtor filed a voluntary petition for relief under Chapter 7 on July 27, 1994. She received a discharge in due course on October 25, 1994.

■ As the Plaintiff's counsel notes, there is virtually no caselaw addressing a situation like the one at bar, and there is none at all in Minnesota. Further, there is no statute on point.[12] Thus, to determine whether there is an enforceable public policy going to the circumstances at bar, it is necessary to examine more general sorts of authority. The Minnesota statutes that govern the multiple relationships among liability insurers, insureds, and claimants are reflections of public policy, as recognized by the legislature. So, too, are the decisions of the Minnesota appellate courts that have applied such statutes to the welter of claims that attorneys often build from events of personal tragedy.

In a complex, interconnected economy and society, the relationship between a liability insurance carrier and its insured involves the public interest. *Lange v. Fidelity & Cas. Co. of N.Y.,* 290 Minn. 61, 185 N.W.2d 881, 886 (1971). Like all other members of our polity, persons who become injured in accidents are in a web of economic and legal relationships, in which their insurers are only one of many constituencies. The harsh consequences of severe injury are also visited upon family members (dependent and not), medical-care providers and medical insurers, and public benefit programs, among others. Recognizing this, the Minnesota Legislature has enacted a number of statutes that reflect the public interest in seeing that liability insurers fully account to their insureds for their due under the indemnification terms of policies.

> Under [Minnesota's] statutory scheme, a liability insurance policy is not a mere indemnity policy protecting only the insured.

*Lange,* 185 N.W.2d at 886.

■ Thus, MINN.STAT. § 60A.08, subd. 14 strictly regulates the ability of a liability insurer to induce its insured to rescind a policy.[13] It reflects a policy judgment on the part of the legislature: insurers may not induce their insureds to back out of their relationship entirely, and may not otherwise knowingly buy their way out of situations where they will have to bear the duties of defense and indemnification to the contractual limits. Clearly, under the law, the maxim is "once an insurer, always an insurer— through the best and worst of exposure." In a very real way, subd. 14 complements the judicially-recognized covenant of good faith. From a different angle, it too prohibits an insurer from leaving an insured vulnerable to a large claim, where the insured is currently or prospectively insolvent.[14]

---

12. The Minnesota legislature has since passed an act to bar an agreement between an insurer and an insured that would

> directly or indirectly transfer to, or release to, the insurer the insured's claim or potential claim against the insurer based upon the insurer's refusal to settle a claim against the insured

MINN.STAT. § 60A.08, subd. 14, as amended by 1996 Minn.Laws, c. 446, art. 1, § 1. This provision, enacted after the present motion was submitted for decision, does not apply here; per the legislation, it was not to be effective until January 1, 1997. 1996 Minn.Laws, c. 446, art. 1, § 73.

13. The text of this statute applicable to this adversary proceeding reads:

> (a) If the insurer has knowledge of any claims against the insured that would remain unsatisfied due to the financial condition of the insured, the insurer and the insured may not agree to rescind the policy.

> (b) Before entering into an agreement to rescind a policy, an insurer must make a good faith effort to ascertain: (1) the existence and identity of all claims against the policy; and (2) the financial condition of the insured.
> (c) An agreement made in violation of this section is void and unenforceable.

14. Contrary to the Plaintiff's argument, however, subd. 14 does not directly apply to the case at bar. Under its classic definition, the equitable remedy of rescission completely undoes a contract. Upon rescission, the parties give up both the benefits and duties of a contract even if it has been partly performed; in the immemorial phrase, they are restored to the *status quo ante.* E.g., *Marso v. Mankato Clinic, Ltd.,* 278 Minn. 104, 153 N.W.2d 281, 290 (1967); *Liebsch v. Abbott,* 265 Minn. 447, 122 N.W.2d 578, 582 (1963); *Scheer v. F.P. Harbaugh Co.,* 165 Minn. 54, 205 N.W. 626, 627 (1925). *See also Myzel v.*

A variant on this theme is presented in MINN.STAT. § 60A.08, subd. 6.[15] This provision similarly preserves the insurer's contractual duties—of both defense and indemnification—when its insured goes into bankruptcy or is de facto insolvent. Ultimately, it preserves the claimant's full recourse, to the extent of policy coverage, even though an insured's legal obligation of payment is discharged in bankruptcy, or rendered ineffectual by a "judgment-proof" status. Essentially, this statute bars the insurer from "piggybacking" on the insured's discharge or insolvency. One consequence clearly is to prompt insurers to be prudent, diligent, and comprehensive in discharging their duty of defense of bankrupt or insolvent insureds, to control and minimize their own liability in indemnification.

Finally, under an express statutory intent "to ensure the prompt, fair, and honest processing of claims and complaints," MINN.STAT. § 72A.201, subd. 1, the Minnesota Legislature has comprehensively regulated the practices of insurers in this regard. See Minnesota Unfair Claims Practices Act, MINN.STAT. §§ 72A.17–32. The Act, admittedly, does not provide for a private right of action, and the Minnesota Supreme Court has declined to construe one. *Morris v. Am. Family Mut. Ins. Co.*, 386 N.W.2d 233, 238 (Minn.1986);

*Glass Serv. Co. v. State Farm Mut. Auto. Ins. Co.*, 530 N.W.2d 867, 872 (Minn.App. 1995). The Plaintiff, however, does not really assert a substantive right of action based on the Act; rather, he cites its mere existence as further evidence of a broad public policy that dictates scrupulous adherence by insurers to the standards of their fiduciary relationship to their insureds in the handling and defense of claims, *Short*, 334 N.W.2d at 387.[16]

None of these statutes speak directly to the facts at bar, but they do fall neatly onto the seamless web in discernible alignment with other aspects of the legal regime governing accident claims and the duties of liability insurers.

Arching over all, of course, are the "public and judicial interests in fair and reasonable settlement of lawsuits." *Cont. Cas. Co. v. Reserve Ins. Co.*, 238 N.W.2d at 864–865; *Jallen v. Agre*, 264 Minn. 369, 119 N.W.2d 739, 743 (1963).

◼ Matching them is the public policy discouraging collusion—the overreaching combination of two parties to a multi-sided dispute, using the forms of law to fraudulently circumvent the rights of other parties and the legal protections given to those rights. *Clinton Co-op. Farmers Elev. Ass'n v. Farm-*

---

*Fields*, 386 F.2d 718, 742 (8th Cir.1967), *cert. den.*, 390 U.S. 951, 88 S.Ct. 1043, 19 L.Ed.2d 1143 (1968). The Plaintiff's counsel loudly insists that "the practical effect of the agreement [for the release] was to rescind the insurance policy," but that just did not happen. The Debtor and Martinez retained the benefit of indemnification under the policy, to the full contractual extent of $100,000.00. To be sure, the Debtor prospectively released the Defendant from its duty of defense in the personal-injury lawsuits, and she gave up her right to enforce or vindicate its "extra-contractual" duty of good faith. However, the release did not affect the finality of the Defendant's performance of its central financial obligation under the facial terms of the policy. There is no such thing as a partial rescission, at least as to an indivisible contract. *Merickel v. Erickson Stores Corp.*, 255 Minn. 12, 95 N.W.2d 303, 306 (1959); *Prince v. Sonnesyn*, 222 Minn. 528, 25 N.W.2d 468, 473 (1947); *Klemmer v. Biersdorf*, 155 Minn. 365, 193 N.W. 592, 593 (1923). Under the clear dictate of subd. 14—and the other statutes yet to be discussed—Martinez's liability policy has to be characterized as indivisible. MINN.STAT. § 60A.08, subd. 14(c), by its terms, does not afford a direct basis for voiding the release.

**15.** This statute deems the following language to be part of every liability insurance policy issues in Minnesota:

> The bankruptcy or insolvency of the insured shall not relieve the insurer of any of its obligations under this policy, and in case an execution against the insured on a final judgment is returned unsatisfied, then such judgment creditor shall have a right of action on this policy against the company to the same extent that the insured would have, had the insured paid the final judgment.

**16.** In *Glass Serv. Co.*, the Minnesota Court of Appeals held that the Act may not be used to establish an element of a common-law claim. 530 N.W.2d at 872. Contrary to the Defendant's insistence, however, this is not really what the Plaintiff is doing. The Plaintiff just cites the existence of the Act as the legislative recognition that these relationships are sensitive, significant, and subject to abuse.

ers Union Grain Terminal Ass'n, 223 Minn. 253, 26 N.W.2d 117, 121 (1947). The judicial bar on enforcement of collusive agreements is not limited to those accompanied by fraud or malice on the part of their engineers. It extends to those that are "collusive in the legal sense"—those which have the *effect* of depriving non-agreeing parties of their participation in a legal process—and a compromise of professional allegiance or self-interest on the part of the agreeing parties or their counsel is not a prerequisite to the characterization. *Koehnen v. Herald Fire Ins. Co.*, 89 F.3d 525, 530 (8th Cir.1996) (applying Minnesota law).

Of more direct applicability are several decisions of the Minnesota Supreme Court in the insurance area. In them, that court recognizes that an insurer that declines to undertake the defense of its insured creates several different sorts of risk, some of which can compromise its contractual duties. The court imposes the brunt of that risk squarely on the insurer. Thus, where an insurer is contesting coverage for a pending personal-injury claim, a claimant and a putative insured may enter an enforceable settlement that acknowledges liability and liquidates damages. If the coverage is later established, the insurer must indemnify to contractual limits, as long as the settlement was reasonable and prudent; it is bound by the terms even though it did not participate in the negotiations and had not had the opportunity to contest the claim on its merits. *Miller v. Shugart*, 316 N.W.2d 729, 734–735 (Minn.1982). The *Miller v. Shugart* court held that such conduct on the part of a claimant and an insured is neither fraudulent nor collusive per se. 316 N.W.2d at 734. It fully acknowledged that the underlying strategy between claimant and insured could place the insurer in a "no-win" situation— faced with the risk of liability for an inflated judgment on the one hand, and the possibility of surrendering its defense to coverage as the cost of containing such liability, on the other.

Nevertheless, ... if a risk is to be borne, it is better to have the insurer who makes

the decision to contest coverage bear the risk.

*Id.*

Expressed pointedly, then, the underlying policy in Minnesota is: where an insurer exposes any one of several constituencies to substantial litigation risk by contesting coverage or obstructing a comprehensive settlement, it must assume a different risk itself—that a separate settlement among other, cooperating parties will include factual or legal concessions that will destroy its own latitude in containing the cost of its duty of indemnification, if it is ultimately proved to have had that duty. Thus, under *Cont. Cas. Co. v. Reserve Ins. Co.*, a primary insurer can be held liable to an excess insurer [17] where, upon the primary insurer's breach of its good-faith duty to settle within its policy limits, the excess insurer reasonably feels compelled to settle the full claim to avoid even greater exposure to the insured. 238 N.W.2d at 864–865. Analogizing to the law of contribution and indemnity, 238 N.W.2d at 865 n. 6, the court in this case reduced the governing principle to its essence:

> Whether on insurance-economics principles or general equitable principles, a party should not be made to bear a loss that rightfully belongs to another party.

238 N.W.2d at 865.

These judicial formulations broadly frame a rule for cases of proven bad faith, which gives the benefit of an extracontractual indemnification to the insured (or excess carrier) that suffers real harm from an insurer's misconduct. The courts recognized the cause of action to redress the actual prejudice that an insured suffers when it takes an adverse excess judgment. The recovery on a bad faith claim is the amount of the predicate excess judgment. This measure contemplates a like-for-like pass-through of the financial consequences after an insurer has obstructed a consensual, steeply compromised resolution of the underlying tort claim. As structured, the cause of action exists only to make an insured whole for the loss occa-

**17.** Definitions of "primary coverage" and "excess coverage" are found in this decision, 238 N.W.2d at 865.

sioned by an insurer's dereliction of its duty of good faith and fair dealing. Not coincidentally, the prospect of the much larger secondary liability acts as an incentive to insurers, to live up to their duties of defense and indemnification as they agreed in the first instance.

These purposes are not only stymied, but perverted, by a sequence like the one at bar: an insured prematurely severs a nascent bad faith claim, before the prejudice to her has even been memorialized in an excess judgment; she takes valuable consideration for giving up that claim; she diverts it to her own, selfish uses, in a way that will preserve the value from claims of creditors; she and the insurer step back from a zealous defense of the tort claim; and then she seeks refuge from the excess judgment in bankruptcy. The result is all the more treacherous when one considers that the shelter of discharge under Chapter 7 was available all along; the parties to the compromise of the bad-faith claim and their attorneys were amply aware of that; and it is apparent that the insured and her legal advisors contemplated a dash into bankruptcy as an intrinsic part of the strategy.[18]

Thus, from the intersection of all of these other enunciations of public policy, a pattern emerges. The release exonerated the Defendant of any consequence of its conduct in handling the insured parties' claims. It relieved the Defendant of the expense and bother of defending itself from any charge that it had mishandled those claims. It took the cause of action premised on any such mishandling out of the Debtor's hands; more crucially, the release took it from the Plaintiff, as successor-in-interest to the Debtor. It accomplished all of these things at a small price to the Defendant, the tendering of $50,000.00 to the Debtor.

The payment of that consideration compensated the Debtor for a prejudice she had not yet suffered, a third-party liability not even fixed and liquidated. More egregiously, the arrangement left the Debtor free to dispose of her compensation in any way she saw fit, with no mandate to apply it to the underlying liability. As a component of a multipart strategy in which discharge in bankruptcy of the third parties' claims was essential, the payment of consideration gave the Debtor a wholly-unearned windfall benefit. Particularly in light of the amassed evidence indicating her high degree of fault for the injured parties' tragedy, the result of the release can truly be said, without exaggeration, to shock the social conscience. *Northern Natural Gas Co. v. Roth Packing Co.*, 323 F.2d 922, 927 (8th Cir.1963).

One need not say any more to compel a conclusion: the execution and enforcement of the release offended public policy under Minnesota law in several respects.

Clearly, it contravened the general policy against collusion. It took the value of the potential bad-faith claim out of the bargaining among the injured parties, the Debtor, and the Defendant. This defeated the injured parties' expectation that that value— whatever it was—would serve as additional financial recourse for them.[19]

In a very limited and stilted sense, it frustrated the general policy in favor of settle-

**18.** The sense of gamesmanship here is reinforced when one considers that a debtor under Chapter 7 can be denied a discharge in bankruptcy where, "with intent to hinder, delay, or defraud a creditor ... [the debtor] has transferred ... property of the debtor, within one year before the date of the filing of the [bankruptcy] petition ..." 11 U.S.C. § 727(a)(2)(A). The Debtor filed her bankruptcy petition more than one year after she executed the release and received her consideration, but barely more than that one year.

**19.** This point is undeniable; it has to be, given the dynamics of settlement in these sorts of cases. Whether insurers like it or not, the bad-faith cause of action is a feature of the legal landscape, and perforce a part of those dynamics. If an insured's conduct creates a bad-faith claim, the cause of action serves a compensatory function; it becomes the means by which the excess judgment will be discharged, lifting it from the insured. One can recognize the injured party's expectation in this way, without having to go so far as the Plaintiff's counsel urge—a holding that public policy "favors" the assignment of bad-faith claims by insureds to injured parties, as part of their own accommodations. That may be the rule in other states, as the Plaintiff's counsel points out, but the Minnesota Supreme Court has not yet so held. In the absence of such a ruling, a federal trial court is scarcely the one to make a holding of such portent.

ments.[20]

More pointedly, it offended the statutory policy that requires liability insurers to shoulder and bear all of their contractual duties to insureds. That duty, if breached, translates into assuming the full legal and financial burden of a bad-faith claim, without boxing off its impact in the way done here.[21]

Finally, it left the Debtor in a position where she had to seek this Court's protection, using discharge in bankruptcy as the capstone to a strategy that left her and her attorney $50,000.00 richer. This result is an affront to the public policy that requires bankruptcy remedies to be administered so as to preserve the integrity of the Code—in a way that affords untainted relief as a last resort, to "honest but unfortunate debtors." Had the Debtor and the Defendant not executed the release, the processes of litigation and settlement would have gone ahead to one of three results. The bad-faith claim could have been settled as part of global accord, in which the injured parties would have released the Debtor from the excess liability. Had it been litigated, and the Debtor prevailed, she would not have been insolvent and in need of bankruptcy. Had the result been the opposite, of course, the Debtor undoubtedly would still have filed; however, she would not be here under the cloud of a tainted windfall. The public interest requires integrity in the dispensing of bankruptcy remedies. That interest, in con-

junction with the state-recognized interests identified earlier, also condemns the release and its results to invalidation.

The release in question, then, violated established public policy. The social conscience should not suffer its enforcement. It is void, and should not be allowed to bar the Plaintiff from proceeding with Count 1.

## II. COUNT 2: AVOIDANCE OF RELEASE, AS TRANSFER ACCOMPANIED BY "ACTUAL FRAUD"

In the second count of his complaint, the Plaintiff seeks a judgment avoiding the release, as a fraudulent transfer within the meaning of MINN.STAT. § 513.44(a)(1).[22] This statute is the so-called "actual fraud" provision of the Minnesota enactment of the Uniform Fraudulent Transfer Act ("UFTA"); it allows the avoidance of transfers of assets when they are made "with actual intent to hinder, delay, or defraud any creditor of [a] debtor."

■ A threshold question, apparently conceded by both sides, is whether the Debtor's execution of the release was a "transfer" cognizable under the UFTA. It was; MINN. STAT. § 513.41(12) [23] includes "release" as an enumerated mode of "transfer."

■ As is almost always the case in "actual fraud" proceedings under the UFTA, the

---

**20.** Contrary to the bland, general pronouncement made by the Plaintiff's counsel, one cannot conclude that it *did*, as an absolute. There is no indication how much Harper and Thurston would have sought to extract indirectly from the Defendant, had their strategic manipulation of bad-faith claims not stopped dead in mid-1993. Then, there is no indication as to the terms, if any, on which the Defendant may have been willing to make those claims go away. Judging by the progression of events, convergence on a figure in settlement was not probable.

**21.** The Defendant loudly insists that the bad faith claims are a spurious artifice, engineered to stretch the limits of its indemnity far beyond that which it contractually assumed. If this proves true, the Defendant has remedies against such pettifoggery under statute, rule, and judicial decision. The point, however, is that the Defendant cannot buy its vindication on the cheap, and that it is especially unsavory to do so by enriching a wrongdoer-insured.

**22.** Plaintiff empowered to invoke this statute by 11 U.S.C. § 544(b):

> The Trustee may avoid any transfer of an interest of the debtor in property ... that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under [11 U.S.C. §] 502 ... or that is not allowable only under [11 U.S.C. §] 502(e) ...

One of the functions of this language is to make fraudulent-conveyance and fraudulent-transfer remedies under state law available to a trustee in bankruptcy. *In re Graven*, 936 F.2d 378, 383 (8th Cir.1991).

**23.** This statute provides:

> "Transfer" means every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset, and includes payment of money, release, lease, and creation of a lien or other encumbrance.

real issue is whether the transfer was accompanied by the proscribed intent. Because, in general, the word "or" has disjunctive effect, *State v. Rossow*, 310 Minn. 399, 247 N.W.2d 398, 400 (1976), the statute is triggered upon proof of any of the three described sorts of intent. *Cf., In re Bateman*, 646 F.2d 1220, 1225 n. 5 (8th Cir.1981) (applying identical language from Bankruptcy Act of 1898, former 11 U.S.C. § 32(c)(4), and concluding that it is reversible error for lower court to end inquiry on objection to discharge in bankruptcy after determining lack of intent to defraud, without separately considering proof of intent to hinder or delay).[24]

In passing on the issue of actual intent, the court may consider certain accompanying circumstances, in the nature of the classic "badges of fraud." These circumstances include, among others, whether the transfer was disclosed or concealed; whether the debtor had been sued or threatened with suit before the transfer was made; whether the transfer was of substantially all the debtor's assets; whether the value of consideration received by the debtor was reasonably equivalent to the value of the asset transferred; whether the debtor was insolvent or became insolvent shortly after the transfer was made; and whether the transfer occurred shortly before or shortly after a substantial debt was incurred. MINN.STAT. § 513.44(b)(3), (4), (5), (8), (9), and (10). The court can also consider any other factor or circumstance that accompanied the transfer. MINN.STAT. § 513.44(b). *See also Citizens State Bank of Hayfield v. Leth*, 450 N.W.2d 923, 927 (Minn.App.1990).

The Plaintiff argues that Count 2 is amenable to summary judgment, on the issue of the Debtor's intent in connection with the release. The Defendant disagrees. The question, then, is whether the evidence of record is one-sided on this issue, or whether it presents a triable fact question. Under the Rule 56 analysis summarized earlier, it is necessary to lay out the points of fact that are not controverted, toward the isolation of those that are.

A number of the circumstances surrounding the execution of the release are uncontroverted, as is the general history that led up to it.[25] In deposition, the Debtor and Young admitted a number of things about their contemporaneous state of mind. The facts thus established are:

1. After his retention to represent the Debtor in mid–1992, Deter started negotiations with Harper to resolve the issue of the Debtor's excess exposure and the interaction of the bad-faith claim with it.

2. At one point Deter offered Harper an accord that would preserve the viability of the bad faith claim, but terminate the Debtor's personal exposure by a covenant not to execute any excess judgment against her personal income or assets.

3. Harper declined this offer. By early December, 1992, negotiations between Deter and the injured parties' attorneys had stalled.

4. After Barbara Martinez filed for bankruptcy relief in early 1993, Deter asked Young whether the Debtor intended to do the same thing.

5. Young replied that she had no current plans, but that he would recommend it to her if she were to receive some sort of consideration for the stress, expense, and delay that she would undergo in having to participate in the lengthy trials in the injured parties' personal-injury lawsuits, and/or in filing for bankruptcy.

6. In a "spontaneous thought," Young suggested to Deter that the framework for passing that consideration could be a settle-

---

**24.** In a number of recent decisions, the Eighth Circuit has given identical construction to the language "with actual intent to hinder, delay, or defraud creditors" wherever it is found—whether that be in state fraudulent-transfer statutes, state-court decisions construing state exemption statutes, 11 U.S.C. §§ 727(a)(2) and 548(a)(1), or other provisions of the Bankruptcy Code. *In re Sherman*, 67 F.3d 1348 (8th Cir.1995); *In re*

*Graven*, 64 F.3d 453 (8th Cir.1995); *Abbott Bank, Hemingford v. Armstrong*, 44 F.3d 665 (8th Cir. 1995); *In re Graven*, 936 F.2d 378 (8th Cir.1991); *In re Armstrong*, 931 F.2d 1233 (8th Cir.1991).

**25.** The facts recited *supra* at pp. 638–641 are also material to the fraudulent-transfer count, in varying degrees, and were considered for the following analysis.

ment of the Debtor's potential bad faith claim against the Defendant, independent of any resolution of the underlying personal-injury actions.

7. After he was retained by the Defendant, Magnuson took over the negotiations with Young on the settlement of the bad faith claim.

8. The negotiations apparently went forward in an unfocused and sporadic fashion until early June, 1993, when it became clear that Harper would not accede to releasing the Debtor from the excess liability and was insisting on proceeding to trial to liquidate Thompson's damages.

9. At that point the Debtor wished to extract herself from all of the pending and potential litigation quickly, and to as great an extent as possible.

10. On advice from Young, she knew that lengthy depositions and trials would require her involvement.

11. Young devised the strategy of settling the Debtor's bad faith claim for $50,000.00, having her put forth only a nominal defense in the trials on the injured parties' lawsuits, and then filing for bankruptcy.

12. Young had not had prior experience in bad-faith litigation. In arriving at the proposed settlement figure, he considered only the personal burden on the Debtor's life and attentions that the various legal procedures would impose. He did not identify or evaluate the facts or the law germane to the bad-faith claim.

13. Young negotiated the terms of the settlement and release with Magnuson before he advised the Debtor that such a resolution was in process, or even possible.

14. Young conceived of incorporating a covenant of confidentiality into the settlement release. He asked Magnuson for this condition, on the ground that he "didn't see any need for it being publicized by either side." Magnuson incorporated the requested provision into the release.

15. Young recognized that the execution of such a release under such circumstances was novel, and that it apparently had not been used before as a legal strategy in Minnesota. He also recognized that litigation to challenge it would almost certainly ensue, at the instance of the injured parties and/or a trustee in bankruptcy.

16. Young reviewed the proposal with the Debtor in mid- or late-June, 1993, explaining all of its terms to her.

17. As a result of that explanation, the Debtor understood:

a. the nature of the bad-faith claim and how it related to the personal-injury claims against her;

b. that she owned the bad-faith claim as property, and had the right to dispose of or assign it;

c. that she had personal exposure to the injured parties' claims, in amounts of $1,000,000.00 or more;

d. that the nature of her involvement in the accident meant that the injured parties could get very substantial verdicts against her;

e. that she could assign the bad-faith claim to the injured parties as part of a settlement with them;

f. that Thurston and, particularly, Harper wished to, and could, put her in the position of assigning the bad-faith claim to their clients, as the price of not "being sued";

g. that the reason that the Defendant would acquiesce to Young's proposal was to prevent her from assigning the bad-faith claim to the injured parties;

h. that if she executed the release and took the money, she would have to assume full personal liability for the injured parties' claims;

i. that as a result she would have to file for bankruptcy, lacking any resources to assume the liability;

j. that once she signed the release, and went into bankruptcy, the injured parties could not get any more money from her.

18. Young advised the Debtor that the decision to accept such terms was entirely hers.

19. Because of her utter lack of familiarity with the legal system, the Debtor re-

posed—and reposes—virtually full trust in Young's advice and judgment.

20. The Debtor pondered the settlement proposal, apparently over a day or more.

21. In structuring the proposal and his accompanying advice to the Debtor, Young used her personal status as one part of his rationale; she was an unwed parent, pregnant, without a stable residence or secure financial means, and badly in need of funds.

22. The Debtor professed to be concerned about the injured parties' interests when she discussed and considered the proposal. Based on Young's representation that the State of Minnesota would meet their huge needs for care, and on her own unfounded belief that somehow the injured parties could still recover money from the Defendant, the Debtor decided that their situation—and her own past guilt over it—should not dissuade her from taking the settlement with the Defendant.

23. Deciding, then, that she was "doing the right thing," the Debtor accepted the settlement. She understood that she would have to file for bankruptcy as a consequence.

24. The Debtor knew that the settlement had to be kept confidential, on advice from Young.

25. In closing and consummating the settlement, Young fully realized that it would be challenged either in the Debtor's bankruptcy case or in a state-court proceeding.

26. Young did not disclose the existence of the release to Harper until after the trial in Thompson's action. After Young substituted as counsel for Deter, Harper suspected that something had changed; his suspicions were not confirmed, however, until several months later.

27. Young held back from any effort to put the Debtor into bankruptcy until the injured parties had received their judgments. He did so on the rationale that the liquidation of their claims should not be delayed by the automatic stay.

28. After the Debtor received her net proceeds from the settlement with the Defendant, Young advised her that investing them in the purchase of a house was the safest way to shelter them from the claims of creditors.

29. The Debtor followed this advice and purchased a house, which she then claimed as exempt in her bankruptcy case.

The question is whether this showing, in its aggregate, "is so one-sided that [the] Plaintiff must prevail as a matter of law" on the issue of intent, or whether it "presents a sufficient disagreement to require submission to a jury." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 251–252, 106 S.Ct. at 2512. The answer does not turn on the character of the issue, as one going to a subjective state of mind. If the basic, undisputed facts aggregate to such weight that no other reasonable inference on the issue of intent is possible, and the Defendant has not produced rebuttal evidence of such firmness and weight to make out a triable issue, the Plaintiff is entitled to summary judgment. *See In re Mathern*, 137 B.R. at 322.

The record at bar fully supports summary judgment in favor of the Plaintiff on Count 2 as well.

Every bit of evidence that the Plaintiff points to supports a finding that Young, as the Debtor's agent, structured the release to divert the value of the bad-faith cause of action away from the injured parties' benefit, and from the trustee in the bankruptcy case that he recognized as inevitable under the circumstances. He went through an analysis that did not take the merits of the cause of action into consideration. Rather, he demanded a specific figure only as a validation of his estimate of the burden of going through the challenge that he knew the settlement would produce.

The record supports a finding that the Debtor fully understood this, too, and knowingly and intentionally proceeded. The accord and the release were made confidential; they were negotiated in the midst of litigation that was nearly certain to impose overwhelming liability on the Debtor; by her own, nearly-contemporaneous admission, the Debtor had no assets of any meaningful value other than the claim; and the Debtor was insolvent under a balance-sheet method of determination. Under MINN.STAT.

§ 513.44(b), all of these facts directly bear on whether she entered the release to frustrate the injured parties from any realization on account of her bad-faith claim. They all support a finding that she did. The fact that her agent negotiated the release clandestinely, made secrecy one of its conditions, and did not disclose it until months after its consummation, makes out an intent to defraud. All of the other circumstances certainly establish an intent to hinder or delay.

Against this evidence, the Defendant offers no more than two aspects of the record. The first is that the Debtor, unversed and unlettered, seemed to be too subject to suggestion by both sides during discovery—first giving an affidavit to support the Plaintiff's motion, then giving more equivocal testimony in deposition. While there is some truth to this as a broad point, there nonetheless is a consistency in the content of her statements under oath, on all of the points summarized above. Her occasional wavering, hesitancy, and inarticulateness do not contradict her admissions as to awareness and intent, and they certainly do not make out a triable dispute of fact—either by the "credibility question" that counsel summarily argues or otherwise.

The second is the Debtor's apparent belief that the insured parties could still somehow extract more money from the Defendant in the wake of the release. This may create a dispute of fact on her knowledge or awareness, but it does not create one as to the material issue of her intent. The record establishes she intended to take the value of the good-faith cause of action fully for herself, without application to the injured parties' claims. Whether she did so thinking that they retained some other recourse against the Defendant is entirely beside the point. The material issue is her intent to take that identified value away from them, and that is established without controversy. This point, then, does not make out an evidentiary basis for a trial on the question of intent either.

As to Count 2, the Defendant has failed to carry its burden under Rule 56. All of the evidence on the question of intent points only in one direction, and that is in favor of the Plaintiff's case. He has made out the two elements of a transfer made with intent to hinder, delay, or defraud the injured parties and himself. The release, then, is vulnerable to avoidance as a fraudulent transfer. The Plaintiff is entitled to his relief on this alternative ground.[26]

### III. RELIEF ACCORDED ON DISPOSITION OF MOTION

■ The disposition of the Plaintiff's motion raises one other issue, not addressed by the parties. As noted earlier, the Plaintiff needed to prevail on one of the latter three counts in his complaint before he could proceed on the first. The present motion implicated two of the latter three counts, but did not concern the first one. As relief on this motion, the Plaintiff requested entry of judgment in his favor on one or both of the counts presented. This request was not inappropriate, under the facial language of Rule 56.

However, the fact that this order disposes of less than the full number of counts presented by the Plaintiff's complaint triggers FED.R.BANKR.P. 7054(a).[27] This rule reflects a policy of federal judicial administration that discourages piecemeal appeals. *Interstate Power Co. v. Kansas City Power & Light Co.*, 992 F.2d 804, 807 (8th Cir.1993). Before making the certification predicate to directing entry of judgment on fewer than all counts pleaded, the trial court must consider the equities involved and should structure relief to promote this policy. *Curtiss–Wright*

---

**26.** The earlier ruling as to Count 4 arguably mooted the other half of the Plaintiff's argument. However, given the advancement of the two theories in the alternative and the strength of the record, it was appropriate to go ahead on Count 4 in the context of this motion.

**27.** By its terms, this rule incorporates the following provision of FED.R.CIV.P. 54(b):

> When more than one claim for relief is presented as an action ... the court may direct entry of a final judgment as to one or more but fewer than all of the claims ... only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment.

Corp. v. Gen. Elec. Co., 446 U.S. 1, 8, 100 S.Ct. 1460, 1465, 64 L.Ed.2d 1 (1980). While the trial court has discretion to make the certification or not, where there is a "significant relationship" between the adjudicated count and those remaining, it should not make it. *In re Flight Transp. Corp. Securities,* 825 F.2d 1249, 1251 (8th Cir.1987), *cert. denied,* 485 U.S. 936, 108 S.Ct. 1113, 99 L.Ed.2d 273 (1988). *See also Hayden v. McDonald,* 719 F.2d 266, 270 (8th Cir.1983) (substantial commonality of facts or similarity of legal or factual issues among adjudicated and unadjudicated counts militates against entry of judgment under Rule 54(b)). In such a case, the first adjudication is appealable of right only after the remaining, interrelated counts have been presented for decision and a judgment consolidating determinations on all of them has been entered.

The determinations made in this order effectively restore Count 1's cause of action to the bankruptcy estate, but they certainly do not address the very weighty issues presented by it. Were judgment entered on the motion at bar, there is little question that the appellate courts would frown on it. *Cf., In re Lull Corp.,* 52 F.3d 787, 788–789 (8th Cir. 1995) (certification under Rule 54(b), and entry of final judgment, on plaintiff's requests for relief are inappropriate until defendant's pleaded affirmative defenses are adjudicated). Therefore, it is appropriate to memorialize this disposition, which will allow the litigation to go forward on Count 1. After the rendering of decision on that count, final judgment would be appropriate and any party deeming itself aggrieved from the combination of rulings may then take an appeal of right.

### ORDER

Based on the Findings of Fact and Conclusions of Law set forth in the memorandum just made,

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED:

1. The release of claims executed by Debtor Linda Jean Mathews in favor of the Defendant on June 30, 1993, violated public policy as enunciated under the law of the State of Minnesota.

2. Accordingly, the release is void and unenforceable, and does not bar the Plaintiff from asserting those causes of action pleaded in Count 1 of his complaint herein.

3. The release of claims executed by Debtor Linda Jean Mathews in favor of the Defendant on June 30, 1993, was given with the intent to hinder, delay, and defraud Brenda N. Carlson and Thomas J. Thompson, who were creditors of hers as of the date of the release, and/or the trustee of the estate in any bankruptcy case that she would thereafter commence via a voluntary petition, within the meaning of MINN.STAT. § 513.44(A)(1).

4. Accordingly, that release, and the transfer or surrender of rights of action pursuant thereto, are avoided pursuant to 11 U.S.C. § 544(b) and MINN.STAT. § 513.47(a).

5. Pursuant to 11 U.S.C. § 551, the transfer of rights of action avoided under Term 3 is preserved for the benefit of the bankruptcy estate of Debtor Linda Jean Mathews.

6. By operation of 11 U.S.C. §§ 550(a)(1) and 541(a)(1), the Plaintiff has succeeded to the interest of Debtor Linda Jean Mathews in the rights of action that were the subject of the lease, and is the real party in interest as plaintiff for the purposes of the further litigation and rendering of judgment on Count 1 of his complaint.

7. Entry of judgment on Terms 1–6 of this order will be deferred, pending entry of an order for judgment on Count 1 of the Plaintiff's complaint.